LAW OFFICES OF JOHN L. FALLAT
John L. Fallat (SBN #114842)
Timothy J. Tomlin (SBN #142294)
Mark A. Vaughn (SBN #241228)
68 Mitchell Blvd., Suite 135
San Rafael, CA 94903-2046
Telephone:  (415) 457-3773
Facsimile:   (415) 457-2667
Email: jfallat@fallat.com
Email: ttomlin@fallat.com
Email: mvaughn@fallat.com

Attorneys for Plaintiff
VICTOR M. RIOS

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| VICTOR M. RIOS, individually and on behalf of himself and all others similarly situated,<br><br>                Plaintiff,<br><br>    vs.<br><br>ZOOM VIDEO COMMUNICATIONS, INC.,<br><br>             Defendant. | Case No.: _____<br><br>**Class Action**<br><br>**CLASS ACTION COMPLAINT DEMAND FOR JURY TRIAL** |

1. Plaintiff Victor M. Rios ("Dr. Rios"), ("Plaintiff"), on behalf of himself and all others similarly situated (the "Class," as defined in paragraph 94 below), submit this complaint against defendant Zoom Video Communications, Inc. ("Zoom") for, among other things, negligence, breach of implied contract, and violations of the California Consumer Privacy Act ("CCPA"), the Consumers Legal Remedies Act ("CLRA"), and the Unfair Competition Law ("UCL"). In support of these claims, Plaintiff alleges the following (a) upon personal knowledge with respect to the matters pertaining to himself, and (b) upon information and belief with respect to all other matters, based upon, among other things, the investigations undertaken by Plaintiff's counsel. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth below after a reasonable opportunity for discovery.

## INTRODUCTION

2. Dr. Rios, is an accredited scholar with a Ph.D. in Comparative Ethnic Studies from the University of California, Berkeley, 2005. He is currently serving as the Associate Dean of Social Sciences, Division of Social Sciences, at the University of California, Santa Barbara. (please see his *curriculum vitae* attached as Exhibit 1). He is an accomplished speaker and presenter as shown by his TED participations in 2012 and 2015. As part of his career as an educator, he reaches out to others through seminars and training in person and through video to educate underserved communities such as minority students to encourage and engage in higher education and on-line learning.

3. Dr. Rios retained Zoom to provide himself and approximate 400 participants with a secure videoconferencing platform, Zoom allowed a "known offender" - one who "has been reported multiple times to the authorities" - to

Zoombomb his webinar on April 30, 2020. As a result, Dr. Rios, and other attendees of the webinar - most of whom were other public school teachers - had their computer screens hijacked and their control buttons disabled while being forced to watch pornographic video footages. The footages were beyond perverse, portraying an adult engaging in a sexual act on an infant.

4.      Because of Zoom's utter failure in providing security, Dr. Rios' webinar was Zoombombed twice within minutes. Traumatized and helpless, Dr. Rios attempted to console his attendees, and allowing them time to talk about and process what had just happened. He immediately reached out to Zoom and demanded action to rectify the situation and to improve security for future videoconferences, but Zoom did nothing.

5.      Unfortunately, Dr. Rios and his participants in his webinar were not the only victims of Zoombombing. Indeed, many other Zoom users, [1] including schoolchildren, [2] fell victim to similar deeply disturbing and traumatizing experiences due to Zoom's failure to maintain adequate security in Zoom videoconferences. [3] As detailed below, Zoom prioritizes profit and revenue over data protection and user security while millions of users in the United States registered with Zoom based on its false advertisements and

---

[1] Colleen Shalby, "Disturbing Zoom-Bombing" incident Hits Fresno State Students, Official Say, L.A. TIMES, Apr. 23, 2020, available at https://www.latimes.com/California/story/2020-04-23/coronaviruszoom-bombing-fresno-state (May 11, 2020).

[2] Valarie Honeycutt Spears, Pornographic Video Appeared During "Zoom bombing" in a KY school Virtual meeting, LEXINGTON HERALD LEADER, Apr. 7, 2020, available at https://www.kentucky.com/news/local/education/article241809326.html (last visited May 11, 2020).

[3] FBI Warns of Teleconferencing and Online Classroom Hijacking During COVID-19 Pandemic, FBI (Mar. 30, 2020), available at https://www.fbi.gov/contact-us/fieldoffices/boston/news/press-releases/fbi-warns-of-teleconferencing-and-online-classroom-hijackingduring-covid-19-pandemic (May 11, 2020).

rely on Zoom's platform to conduct their business during this pandemic. This civil complaint will apparently be the sixth (6th) one filed in this USDC based upon this outrageous conduct.

6.     On behalf of Plaintiff and other similarly situated Class members, this class action seeks equitable relief against Zoom and damages sustained by the Class as a result of Zoom's:

- unlawful sharing of users' personal information with third parties including Facebook, Inc., without adequate notice to or authorization from users;
- failure to safeguard its users' confidential, sensitive personal information;
- failure to provide adequate security, as promised, to avoid breach and infiltration (e.g., "Zoombombing") of users' videoconferences; and
- unfair, unlawful, and deceptive business practices relating to Zoom's data security.

7.     Zoom provides video-communication services using a cloud platform for video and audio conferencing, collaboration, chat, and webinars. Founded in 2011, Zoom became a publicly traded company just a year ago (in April 2019), and reported over $622,658,000 in revenue for the fiscal year ending January 31, 2020. Today, Zoom has a market capitalization of 56 billion. Millions of consumers use Zoom's services daily.

8.     In the wake of the global COVID-19 pandemic, demand for Zoom's services exploded because hundreds of millions of people - all under stay-at-home orders – resort to videoconferencing to connect with others for

CLASS ACTION COMPLAINT
DEMAND FOR JURY TRIAL
4

work and social functions. In recent weeks, Zoom has become the virtual classroom for millions of schoolchildren and workspace for many businesses and government agencies. The number of meeting participants across Zoom has jumped from 10 million in December 2019 to 200 million in March 2020.

9. As the usage of Zoom's services skyrockets, so do its collection and use of users' personal information. The importance of security of Zoom's videoconferences cannot be overstated because Zoom provides services to many critical government agencies responsible for combating the COVID-19 pandemic, including the Center for Disease Control and Prevention ("CDC") and the U.S. Department of Homeland Security ("DHS")[4] but as to members of the general public such as Dr. Rios and the class, appear to not care very much at all about security and privacy issues.

10. While Zoom enjoyed its success due to the hike of revenues and its stock price resulting from the explosion of demands for its services, Zoom's unlawful collection and use of users' personal information and its lack of adequate security came to light in a series of articles published in late March

---

[4] Zoom for Government, available at https://zoom.us/government (last visited Apr. 6, 2020) (featuring photos of law enforcement and military personnel at work and listing under "Organizations that love Zoom" eight government agencies, including the CDC, DHS, the Colorado Department of Corrections, the Hawaii State Department of Health the Los Angeles Police Department, and the City of San Jose), whereas the US DOD has banned use between service members and DOD civilians (www.starsandstripes) (April 14, 2020).

CLASS ACTION COMPLAINT
DEMAND FOR JURY TRIAL

and early April 2020 in Vice,[5] The New York Times,[6] the Washington Post,[7] The Wall Street Journal,[8] and other news outlets.[9]

11.    As revealed in these news reports, Zoom uses data-mining tools to collect users' personal information and shares it with third parties without users' consent. Zoom allows these third parties to use such personal information to target users with advertisements.

12.    Zoom also fails to implement proper security measures to protect users' privacy and secure their videoconferences. As a result, "Zoombombing" by uninvited participants has become frequent. Contrary to Zoom's promises, Zoom's videoconferences are not end-to-end (also known as "E2E") encrypted. This means that in addition to the participating users, Zoom has the technical ability to spy on the videoconferences and, when compelled by the government or others, to reveal the contents of the videoconferences without the users' consent.

13.    Zoom's privacy violations and security breaches quickly commanded the attention of 27 state attorneys general and the Federal Bureau

---

[5] Joseph Cox, Zoom iOS App Sends Data to Facebook Even If You Don't Have a Facebook Account VICE, Mar. 26, 2020 available at https://www.vice.com/en_us/article/k7e599/zoom-ios-app-sends-data-to-facebook-even-if-you-dont-have-a-facebook-account (last visited May 11, 2020)(the "vice Report").

[6] Taylor Lorenz & Davey Alba, "Zoombombing" Becomes a Dangerous Organized Effort, THE NEW YORK TIMES, Apr. 3, 2020 (the "Times Zoombombing Report"); Aaron Krollik & Natasha Singer, a Feature on Zoom Secretly displayed Data from People's LinkedIn Profiles, THE NEW YORK TIMES, Apr.2, 2020 (the Times LinkedIn Report").

[7] Drew Harwell, Everybody Seems to be Using Zoom. But Its Security flaws Could Leave users at Risk, THE WASHINGTON POST, Apr. 2, 2020 (the "Post Report").

[8] Aaron Tilley & Robert McMillan, Zoom CEC: "I Really Messed Up" on Video Platform's Security, THE WALL STREET JOURNAL, Apr. 4, 20920 (the WSJ Report").

[9] Micah Lee & Yael Grauer, Zoom Meetings Arent' End-to-End Encrypted, Despite Misleading Marketing, THE INTERCEPT, Mar. 31, 2020, available at https://theintercept.com/2020/03/31/zoom-meeting-encryption/ (last visited May 11, 2020).

CLASS ACTION COMPLAINT
DEMAND FOR JURY TRIAL

of Investigation ("F.B.I."). On March 30, 2020, the New York Attorney General sent a letter to Zoom expressing concerns over and inquiring about its data-privacy and security practices. And on March 31, 2020, the F.B.I. issued a warning singling out Zoom based on "multiple reports of conferences being disrupted by pornographic and/or hate images and threatening language." *See* Post Report, fn. 7.

14. While millions of consumers and thousands of businesses and government agencies continue to rely on Zoom to conduct their business during the COVID-19 pandemic, the data-privacy violations and security vulnerabilities at Zoom remain unremedied.

15. By bringing this class action on behalf of themselves and other Zoom users, Plaintiff seeks (a) damages for his loss of revenue and reputation for Zoom's violations of his and the privacy rights of the class and its unfair, unlawful, and deceptive business practices; and (b) restitution and injunctive relief prohibiting Zoom from continuing its unfair, unlawful, and deceptive business practices.

## PARTIES

### I.    Victor M. Rios

16. Plaintiff Dr. Rios is a citizen of California.

17. Dr. Rios registered an account with Zoom on April 13, 2020 using an Apple computer at his home office.  He has registered this account with Zoom for personal use, to stay in contact with his current and former clients, using his personal email address and personal computer.

18. Dr. Rios was not aware, and did not understand, that Zoom would share his personal information with third parties, including Facebook.  Nor was

he aware that Zoom would allow third parties, like Facebook, to access his personal information and combine it with content and information from other sources to create a unique identifier or profile of him for purposes of advertisement.

19.    In fact, Dr. Rios registered with Zoom as a user and used Zoom's services in reliance on Zoom's promises that (a) Zoom does not sell users' data; (b) Zoom takes privacy seriously and adequately protects users' personal information; and (c) Zoom's videoconferences are secured with end-to-end encryption and are protected by passwords and other security measures.

## II.    Defendant Zoom Video Communications, Inc.

20.    Defendant Zoom Video Communications, Inc. is a Delaware corporation with its principal place of business in San Jose, California. Zoom was founded in 2011 and became a public company in April 2019. Today, Zoom employs a staff of over 1,700 and generates hundreds of millions of dollars in annual revenue.

21.    Zoom provides video-communication services. The demand for Zoom's services has exploded in the wake of the COVID-19 pandemic while hundreds of millions of Americans are under orders to stay at home. As a result of the explosion of user demand, Zoom's stock price skyrocketed in recent months. On June 1, 2020, Zoom's stock closed at above $204.00 per share – nearly tripling its closing price at the beginning of 2020.

## JURISDICTION AND VENUE

22.    This Court has subject-matter jurisdiction under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2). The matter in controversy,

exclusive of interest and costs, exceeds the sum or value of $5,000,000, and members of the Class are citizens of different states from Zoom.

23.   This Court has personal jurisdiction over Zoom because it maintains headquarters in San Jose within the County of Santa Clara, over which this District presides. Zoom regularly conducts business in this District.

24.   Venue is proper in this Court under 28 U.S.C. § 1391 because (a) Zoom   transacts business in this District; (b) substantial events and transactions giving rise to this action took place in this District; and (c) many members of the Class reside in this District.

## INTRADISTRICT ASSIGNMENT

25.   In compliance with Local Rule 3-2(b), Plaintiff requests that this action be assigned to the San Jose Division of this District because a substantial part of the events or conduct giving rise to the claims in this action occurred in the County of Santa Clara, and this complaint appears to be the sixth (6th) case filed on these issues in the Division largely assigned to the Honorable Lucy Koh.

## FACTUAL ALLEGATIONS

**I.   Zoom Targets Consumers, Businesses, and Government Agencies with Promises of Protecting User Privacy and Ensuring Data Security**

26.   A fast-growing tech company founded in San Jose in 2011, Zoom provides a "video-first communications platform that ... connect[s] people through frictionless video, phone, chat, and content sharing and enable[s] face-to-face video experiences for [up to] thousands of people in a single meeting

across disparate devices and locations."[10]   Zoom generates revenue from the "sale of subscriptions to [its] platform." Zoom Annual Report at 13. As Zoom itself acknowledges, "security and privacy" are among the key factors affecting its growth and revenue. *Id.*

27.   Zoom regularly collects from its users a massive volume of personal information, including names, usernames, physical addresses, email addresses, phone numbers, employment information, credit/debit cards, and cookies and pixels, e.g., through the use of Google Analytics and Google Ads. When users visit Zoom's websites, such as zoom.us and zoom.com, Zoom uses "cookies and tracking technologies" to collect valuable personal data from users:

> **Zoom collects information about you when you visit our marketing websites,** unless you tell us not to by adjusting your cookie setting. We use such things as cookies and tracking technologies from our advertising service provider tools (e.g., Google Ads). Information collected includes Internet protocol (IP) addresses, browser type,   Internet service provider (ISP), referrer URL, exit pages, the: files viewed on our marketing sites (e.g., HTML pages, graphics, etc.), operating system, date/time stamp, and/or clickstream data.

---

[10] Zoom's 2020 Annual report filed in Form 10-K on March 20, 2020 with the U.S. Securities and Exchange Commission, at 4, available at https://investors.zoom.us/static-files/09a01665-5f33-4007-8e90-de02219886aa (visited Apr. 6, 2020) ("Zoom Annual Report").

**We use this information to determine the offers to make for our services, analyze trends on and run the marketing site, and understand users' movements around the marketing site. We also gather information about our visitors, such as location information at the city level (which we get from IP addresses) for tailoring advertising and selecting the language to use to display the website.**

**Zoom does use certain standard advertising tools on our marketing sites which, provided you have allowed it in your cookie preferences, sends personal data to the tool providers, such as Google.**

Zoom Privacy Policy, available at https://zoom.us/privacy (last visited Apr.6, 2020).[11] Even though Zoom concedes that its "use" of personal information "may be considered a 'sale' within the meaning of the CCPA, Zoom insists that it "is not selling any data."

28.   In fact, Zoom boasts of its commitment to user privacy:

**Privacy is an extremely important topic, and we want you to know that at Zoom, we take it very seriously**

> • **We do not sell your personal data.** ...
> **Zoom collects only the user data that is required to provide you Zoom services.** This includes technical and operational support and service improvement. For example, we collect information such as a user's IP address and OS and device details to deliver the best possible Zoom experience to you regardless of how and from where you join.

---

[11] Unless otherwise noted, all emphases are added.

CLASS ACTION COMPLAINT
DEMAND FOR JURY TRIAL

11

• **We do not use data we obtain from your use of our services, including your meetings, for any advertising.** We do use data we obtain from you when you visit our marketing websites, such as zoom.us and zoom.com. You have control over your own cookie settings when visiting our marketing websites.

29.     Zoom also advertises that it "take[s] security seriously." On its website, Zoom boasts that it "exceed[s] industry standards" in terms of security measures. Zoom further promises that it "is committed to protecting [users'] privacy," and claims that it has" designed policies and controls to safeguard the collection, use, and disclosure of [users'] information." According to Zoom, it "places privacy and security as the highest priority in the lifecycle operations of our communications infrastructure…".

30.     With regard to security in videoconferences, Zoom has, in various parts of its website and in its marketing materials, represented that it uses end-to-end (or E2E) encryption to secure its videoconferences:

**Meet securely**

**End-to-end encryption for all meetings …**

*** 

**Protect your Meetings**

**The following in-meeting security capabilities are available to the meeting host:**

•       **Secure a meeting with end-to-end encryption**

        *       *       *

**Enables HIPPA, PIPEDA & PHIPA Compliance**

**Zoom's solution and security architecture provides end-to-end encryption and meeting access controls so data in transit cannot be intercepted.**

31.     As noted in the Intercept Report, Zoom's bald and unequivocal promise of end-to-end encryption is important to consumers because it is "widely understood as the most private form of internet communication." An end-to-end encrypted videoconference means that "the video and audio content [are] encrypted in such a way that only the participants in the meeting have the ability to decrypt it." See Intercept Report. In other words, only the videoconference participants themselves - not Zoom or any other third parties -have access to the contents of their videoconferences.

32.     As detailed below, however, Zoom's promise of end-to-end encryption is false.  In fact, in response to the Intercept's revelation of its false promises regarding end-to-end encryption, a Zoom spokesperson admitted in late March 2020 that "[c]urrently, it is not possible to enable E2E encryption for Zoom video meetings" due to the design and operation of Zoom's platform.

33.     In addition to end-to-end encryption, Zoom also boasts its capacity to "secure" a meeting "with password" using ts "[r]ole-based user security":

Client Application

Role-based user security

The following pre-meeting security capabilities are available to the meeting host:

**Enable an end-to-end (E2E) encrypted meeting**

◦ Secure log-in using standard username and password ... sign-on

• Start **a secured meeting with password**

• Schedule a secured meeting with password

\*    \*    \*

**Meeting Security**

**Role-based user security**

**The following m-meeting security capabilities are available to the meeting       host:**

**• Secure a meeting with E2Eencryption**

**...**

**• Expel a participant or all participants**

**• End a meeting**

**•Lock a meeting**

**...**

**• Mute/unmute a participant or all participants**

**...**

**• Enable/disable a participant or all participants to record ...**

See Zoom Security Guide, available at https://zoom.us/docs/doc/Zoom-Security-White-Paper.pdf (last visited Apr. 6, 2020). As detailed below, however, Zoom's representations regarding security of its videoconferences are false because "'Zoombombing' ... by uninvited participants ha[s] become frequent." *See* fn. 6, New York Times Zoombombing Report.

34.     Yet Zoom profits from these false promises of data protection and security.  Before the COVID-19 outbreak, Zoom induced - using these false promises - millions of consumers, as well as business and government agencies, to register for its services. The volume of Zoom's business generated an annual

revenue of $622.7 million in the fiscal year of 2020 (ending January 31, 2020). *See* fn. 10, Zoom Annual Report at 38. In April 2019, Zoom issued 20 million shares of its common stock at $36 per share in a successful initial public offering.

35.    Since the outbreak of the COVID-19 pandemic, the demand for Zoom's services has skyrocketed:

> Zoom was used by more than 200 million callers
> [in March 2020], up from 10 million in December
> [2019], and is used in more than 90,000 schools
> across 20 countries .... More than 5 million people
> in the United States used Zoom's mobile apps on
> [April 1, 2020], five times more than a month ago,
> dwarfing the competition of its top rivals, including
> Skype, Slack, Google Hangouts and Microsoft
> Teams ....

*See* Post Report. According to the app data firm SensorTower, "first-time installs of the videoconferencing company's mobile app rose by 1,126 percent in March to more than 76 million, up from just 6.2 million in February. *"See* fn. 6, New York Times Zoombombing Report.

36.    Likewise, Zoom's stock price has skyrocketed. Today, Zoom amasses over $57 billion in market capitalization. Zoom's exponential growth of market capitalization is predicated upon users' trust in its promises of data privacy and security, but these promises are false.

## II.     Zoom Broke Its Promises of Data Privacy and Security

### A.     Zoom Collected and Disclosed Users' Personal Information Without Authorization or Consent

37.     Zoom's promises of data privacy and security are false. As revealed in the Vice Report, the iOS version of Zoom's mobile app sent users' personal information to Facebook for use in targeted advertising, without first notifying the users or obtaining their consent. Zoom provided users' personal information to Facebook even for users who do not have Facebook accounts. *See* fn. 5, Vice Report.

38.     According to the Vice Report, upon downloading and opening the app, Zoom would connect to Facebook's Graph API ("application program interface") a primary way to get data into and out of the Facebook platform.

39.     When a Zoom user opens the iOS version of the Zoom app, Zoom would notify Facebook that the user has opened the app and identify the user's device, i.e., the model, time zone, physical location, and telephone carrier. Such personal information then generates a unique identifier that enables companies like Facebook to target the user with advertisements. Advertisers then use the identifier to track data so that they can deliver customized advertising. The identifier is also used for tracking and identifying a user, allowing whoever is tracking it to identify a user when he or she interacts with or responds to advertisements. An identifier is similar to a cookie as it allows advertisers to know that a specific user is viewing a specific publication so that it can serve an advertisement targeting that user. Such identifiers are extremely valuable in the online advertising industry.

40.     According to one privacy-protection expert, Zoom's practices of data collection and data sharing are "shocking," because "[t]here is nothing in [Zoom's] privacy policy that addresses that." *Id.*

41.     Aside from the lack of any notice, Zoom's data-sharing activity was not visible to users because they can only see the Zoom app interface. Thus, Zoom provides users **no opportunity to consent to or opt out of** Zoom's data-sharing with Facebook. Zoom's lack of disclosure and failure to provide an opportunity to opt out is particularly glaring in light of Facebook's own admonition to developers like Zoom to give notice:

> Facebook told [Vice] it requires developers to be transparent with users about the data their apps send to Facebook. Facebook's terms say "If you use our pixels or SDK [(software development kits)], you further represent and warrant that you have provided robust and sufficiently prominent notice to users regarding the Customer Data collection, sharing and usage," and specifically for apps, "that third parties, including Facebook, may collect or receive information from your app and other apps and use that information to provide measurement services and targeted ads." *Id.*

42.     Indeed, after being confronted with Vice's findings, "Zoom confirmed the data collection in a statement to [Vice]":

> We originally implemented the 'Login with Facebook' feature using the Facebook SDK in order to provide our users with another convenient way to access our platform. However, we were

recently made aware that the Facebook SDK was collecti.ng unnecessary device data [as identified by Vice.]...

To address this, in the next few days, we will be removing the Facebook SDK and reconfiguring the feature so that users will still be able to login with Facebook via their browser. Users will need to update to the latest version of our application once it becomes available in order for these changes to take hold, and we encourage them to do so. We sincerely apologize for this oversight, and remain firmly committed to the protection of our users' data. *Id.*

43.     Despite admitting to the "oversight" and purporting to release a new version of the Zoom app (as of March 27, 2020) as a remedy, the harm to Plaintiff and other Class members, as well as the violations of their privacy, have occurred and continue to occur because, even assuming no unauthorized disclosure of personal information is made through the new version, the previous version of the app remains operational.  Moreover, Zoom failed to mandate the use of the new version of the app. Nor did Zoom do anything to rectify its previous egregious violations of users' privacy rights.

44.     Upon information and belief, Zoom provides users' personal information to other third parties, in addition to Facebook, for unauthorized purposes, including use in targeted advertising.

45.     Plaintiff and other reasonable Zoom users did not know that when they signed up to use Zoom's services that Zoom would share their personal information with third parties for the purpose and in the manner set forth above, and that their privacy rights would be violated. Had Plaintiff and other users

known about Zoom's data-sharing practices, they would not have signed up with Zoom and would not have used Zoom's services.

46.     Zoom's unlawful disclosure of users' personal information is not limited to Facebook. According to the Times LinkedIn Report (fn. 6), Zoom used data-mining tools to collect users' personal information without authorization, then used the personal information to match the users' LinkedIn profiles:

> For Americans sheltering at home during the coronavirus pandemic, the Zoom videoconferencing platform has become a lifeline, enabling millions of people to easily keep in touch with family members, friends, students, teachers and work colleagues.
>
> But what many people may not know is that, until Thursday, a data- mining feature on      Zoom allowed some participants to surreptitiously have access to LinkedIn profile data about other users -without Zoom asking for their permission during the meeting or even notifying them that someone el.se was snooping on them.
>
> The undisclosed data mining adds to growing concerns about Zoom's business practices at a moment when public schools, health providers, employers, fitness trainers, prime ministers and queer dance parties are embracing the platform.
>
> An analysis by *The New York Times* found that when people signed in to a meeting, **Zoom's software automatically sent their names and** email addresses to a company

system it used to match them with ***their LinkedIn profiles.***

47.     As *The New York Times* noted, "neither Zoom's privacy policy nor its terms of service specifically disclosed that Zoom could covertly display meeting participants' LinkedIn data to other users or that it might communicate the names and email addresses of participants in private Zoom meetings to LinkedIn." *Id.* In fact, "user instructions on Zoom suggested just the opposite: that meeting attendees may control who sees their real names." *Id.* Accordingly, ***"privacy experts criticized Zoom for making*** the data-mining tools available during meetings without alerting ***participants as they were being subjected to them."*** *Id.*

48.     Although Zoom claims that, after the revelations made in the Times LinkedIn Report, it discontinued the practice of mining and revealing users' LinkedIn information without authorization, Zoom has done nothing to rectify its past violations of users' privacy and unlawful practices of unauthorized data mining, collection, and disclosure.

## B.     Zoom Failed        to Implement Adequate Security Protocols Jeopardizing Users' Account Security

49.     Zoom's inadequate security practices were exposed again on April 15, 2020,   when an information security and technology news publication, *BleepingComputer,* reported that hackers were selling half a million Zoom account in the dark web:[12]

---

[12] Sergiu Gatlan, Exploit for Zoom Windows Zero-Day Being Sold for $500,000.00, BLEEPINGCOMPUTER, Apr. 15, 2020, available at https://www.bleepingcomputer.com/news/security/expoint-for-zoom-windows-zero-day-being-sold-for 500-000/ (last visited May 11, 2020).

An exploit for a zero-day remote code execution vulnerability affecting the Zoom Windows client is currently being sold for $500,000, together with one designed to abuse a bug in the video conferencing platform's macOS client.

*      *      *

As BleepingComputer reported on Monday, more than 500,000 Zoom accounts are being sold on hacker forums and on the dark web for less than a penny each, and, in some cases, also given away for free to be used in zoombombing pranks and various other malicious activities.

50.    The information relating to these half a million Zoom accounts was published and exchanged online without Zoom users' consent or knowledge. Zoom is responsible for violating users' privacy due to its failure to implement adequate security protocols and review procedures that could have and should have prevented the hacking of these accounts.

51.    As a result of Zoom's failures, Plaintiff and other Class members are subjected to increased risks of imminent harm to their privacy rights.

C.    **Zoom Failed to Maintain Adequate Measures to Protect Data Privacy and Ensure Videoconference Security**

52.    On Zoom's websites and in its marketing materials, Zoom has repeatedly touted the security of its videoconferences in that they are protected by passwords and end-to-end encryption. In reality, however, Zoom's videoconferences are vulnerable to hacking as evident in the increased frequency of Zoombombing. Worse, as Zoom admitted in its recent

disclosures, **Zoom lacks the capacity to implement end-to-end encryption.**

53.    As noted in the Intercept Report at fn.9, Zoom "claims to implement end-to-end encryption, widely understood as the most private form of internet communication, protecting conversations from all outside parties." But this is false. In fact, "Zoom is using its own definition of the term, **one that lets Zoom itself access unencrypted video and audio from meetings."**

54.    When confronted by the Intercept regarding this false representation, Zoom all but admitted that it lacks the technology to protect videoconferences with end-to-end encryption:

> But when reached for comment about whether video meetings are actually end-to-end encrypted, a Zoom spokesperson wrote, "Currently, it is not possible to enable E2E encryption for Zoom video meetings. Zoom video meetings use a combination of TCP and UDP. TCP connections are made using TLS and UDP connections are encrypted with AES using a key negotiated over a TLS connection."

> The encryption that Zoom uses to protect meetings is TLS, the same technology that web servers use to secure HTTPS websites. This means that the connection between the Zoom app running on a user's computer or phone and Zoom's server is encrypted in the same way the  connection between your web browser and this article (on https://theintercept.com) is encrypted. **This is known as transport encryption, which is different from end-to-end encryption because the Zoom service itself can**

**access the unencrypted video and audio content of Zoom meetings.** So when you have a Zoom meeting, the video and audio content will stay private from anyone spying on your Wi-Fi, but it won't stay private from the company. (In a statement, Zoom said it does not directly access, mine, or sell user data; more below.)…

"**When we use the phrase 'End to End' in our other literature, it is in reference to the connection being encrypted from Zoom end point to Zoom end point,"** the Zoom spokesperson wrote, apparently referring to Zoom servers as "end points" even though they sit between Zoom clients. "The content is not decrypted as it transfers across the Zoom cloud" through the networking between these machines. *Id.*

55.     According to one cryptographer, Professor Matthew D. Green of Johns Hopkins University's Department of Computer Science, Zoom is twisting the common meaning of "end-to-end" in a **"dishonest way"**:

"They're a little bit fuzzy about what's end-to-end encrypted," Green said of Zoom. "I think they're doing this in a slightly dishonest way. It would be nice if they just came clean." *Id.*

56.     Caught red-handed, Zoom apologized on April 1, 2020 "in a blog post for the 'discrepancy between the commonly accepted definition of end-to-end encryption and how [Zoom was] using it." *See* fn. 7, Post Report.

57.    Zoom's dishonesty is particularly glaring in light of the fact that several of Zoom's competitors, including Apple FaceTime and Signal, offer real end-to-end encryption in their videoconferences:

> "If it's all end-to-end encrypted, you need to add some extra mechanisms to make sure you can do that kind of 'who's talking' switch, and you can do it in a way that doesn't leak a lot of information. You have to push that logic out to the endpoints," he told The Intercept. This isn't impossible, though, Green said, as demonstrated by Apple's FaceTime, which allows group video conferencing that's end-to-end encrypted. **It's doable. It's just not easy.** *See* fn. 9, the Intercept Report.

58.    Thus, it is not that Zoom could not have fulfilled its promise of end-to-end encryption. It is that Zoom made a conscious decision to make the false promise knowing that it lacked the technology to keep the promise.

59.    Moreover, Zoom has done nothing, aside from issuing empty words in a blog- posted "apology," to improve security in its videoconferences and to rectify past security breaches.

60.    Likewise, as discussed above, Zoom's marketing materials provide users with a false sense of security regarding its videoconferences.

61.    But Zoom's videoconferences are anything but secure. In recent weeks, Zoombombing has become a daily element of Zoom's videoconferences:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

> [Zoom] has faced added pressure from the rise of "zoombombing" raids, in which anonymous trolls barge into unlocked Zoom meetings, shouting profane insults and racist slurs. Videos of the raids, some of which have been removed by YouTube for violating hate-speech policies, show giggling trolls posting pornography into online grade-school lessons, pulling their pants down in front of company conference calls, and dancing with bottles of bourbon in what appeared to be an online Alcoholics Anonymous meeting.

*See* fn. 7, Post Report.

62.     By failing to properly maintain security in its videoconferences, Zoom has enabled hackers and pranksters to perpetrate online abuse on a massive scale:

> An analysis by The New York Times found 153 Instagram accounts, dozens of Twitter accounts and private chats, and several active message boards on Reddit and Chan where thousands of people had gathered to organize Zoom harassment campaigns, sharing meeting passwords and plans for sowing chaos in public and private meetings (since this article's publication, Reddit has shut down the message boards where Zoom raids were discussed).

> Zoom raiders often employ shocking imagery, racial epithets and profanity to derail video conferences. Though a meeting organizer can remove a participant at any time, the perpetrators of these attacks can be hard to identify; there may be

> several in a single call, and they can appear to jump from one
> alias to another.

*See* fn. 6, *New York Times* Zoombombing Report.

63.    The frequency and reach of the incidents on Zoom prompted the F.B.I. to issue a warning on [March 31, 2020], singling out the [Zoom] app and stating that it had "received multiple: reports of conferences being disrupted by pornographic or hate images and threatening language' nationwide." *Id.*

64.    In addition to the F.B.I., other state and federal authorities also intervened.  The attorneys generals of 27 states, including New York, have raised questions about privacy issues and demanded that Zoom cooperate with them in multiple investigations.  *See* fn. 8, the WSJ Report. Senator Richard Blumenthal of Connecticut wrote a letter to Zoom on March 31, 2020 demanding answers about Zoom's "'troubling history of software design practices and security lapses.'" *Id.* Senator Blumenthal expressed grave concerns over Zoom's privacy violations and security breaches:

> **The millions of Americans** now unexpectedly attending
> school, celebrating birthdays, seeking medical help, and sharing
> evening drinks with friends over Zoom during the coronavirus
> pandemic, ... **should not have to add privacy and cyber**
> **security fears to their ever-growing list of worries.**

*Id.* (internal quotation marks omitted).

65.    In its public disclosures, Zoom admits that its security is inadequate. Zoom's founder and Chief Executive Officer, Eric Yuan, told The Wall Street Journal: "I really messed up" on Zoom's security. *See* fn. 8, the WSJ Report.  But Zoom has done little to improve security. While Mr. Yuan

promised to develop "an option for end-to-end encryption to safeguard conversations, ... [the] feature won't be ready for a few months." *Id.*

66.    While Zoom continues to make empty, false promises, American consumers are left to deal with the privacy violations and security breaches inflicted by Zoom and, in Senator Blumenthal's words, "add[ing] privacy and cybersecurity fears to their ever-growing list of worries." *Id.*

67.    On behalf of these American consumers, Plaintiff brings this action for damages and injunctive relief to rectify Zoom's misconduct.

**III.    Plaintiff' Experience with Zoom and Zoombombing**

**A.    Dr. Rios Registered his Account with Zoom in Reliance on Its False Representations of Data Protection and Conference Security**

68.    Dr. Rios has been conducting seminars, workshops, trainings, and motivational programs for at-risk students and teachers for over a decade.

69.    Following California's March 4, 2020 declaration of a state of emergency as a result of the COVID-19 pandemic, Dr. Rios began searching for alternative meeting venues to conduct his regular seminars with educators and students. Based on Zoom's advertisements of a user-friendly and secure platform, Zoom videoconferencing stood out as a prime candidate for conducting online classes.

70.    On April 13, 2020, Dr. Rios, serving as his administrator, registered an account with Zoom, using his personal email address. On March 23, 2020, following the March 19, 2020 issuance of the statewide Executive Order N-33-20 (directing all California residents to stay at home), Dr. Rios upgraded his Zoom account to" premium" status by paying a monthly fee of

$14.99. He also upgraded his Zoom account to host up to 500 participants for $112.00 per month. Dr. Rios downloaded Zoom's software onto an Apple desktop computer.

71.     At the time when Dr. Rios registered his account with Zoom, Dr. Rios was not aware, and did not understand, that Zoom would share Dr. Rios' personal information with third parties, including Facebook. Nor was Dr. Rios aware that Zoom would allow third parties, like Facebook, to access his personal information and combine it with content and information from other sources to create a unique identifier or profile of Dr. Rios for purposes of advertisement.

72.     In fact, Dr. Rios registered with Zoom as a user and used Zoom's services in reliance on Zoom's promises that (a) Zoom does not sell users' data; (b) Zoom takes privacy seriously and adequately protects users' personal information; and (c) Zoom's videoconferences are secured with end-to-end encryption and are protected by passwords and other security measures.

**B.     Dr.  Rios  and  His  Participants  Became  Victims  of Zoombombing**

73.     Dr. Rios prepared for a Zoom videoconference to educate teachers on how to connect with at-risk students who were not logging in to remote learning sessions.  This was a free community service he was providing teachers who were interested. He set up the Zoom videoconference, following Zoom's instructions. Based on Zoom's representations, he understood that the videoconference would be protected and secure, and that, as the organizer, he would have the ability to control the webinar, including being safe from any uninvited or malicious participants.

74.     For the April 30, 2020 webinar (starting at 3:00 p.m. Pacific Time), Dr. Rios setup a Zoom videoconference, following Zoom's instructions.

75.     The April 30, 2020 webinar was held on Zoom with over four hundred (400) participants, including Dr. Rios as the organizer. The class was uneventful until approximately 15 minutes into the class, when an intruder with the name "Christine's iPad" hacked into the videoconference.

76.     Immediately following the break-in, pornographic video footages began to run on all participants' computers in a full-screen mode and with loud audio. Dr. Rios and the other participants were forced to view footage of an adult performing a sexual act on an infant. Dr. Rios was supervising break-out sessions during the attack and neither him or other participants were unable to minimize or close the video screen. Nor were they able to use any of the Zoom functions to refuse viewing the pornographic video or eject the intruder (Christine's iPad) from the Zoom meeting.  After attempting to avoid the pornographic video and eject the intruder to no avail - the intruder returned immediately.

77.     Pornographic video footages reappeared on every participant's computer -again on full screen mode with loud audio. The footages again involved an adult engaging in sexual acts and performing sexual acts on a crying infant.

78. After many attempts, Dr. Rios figured out how to lock the meeting and eliminate the intruder.

79.     The depravity of the video footages was beyond description. Dr. Rios and the other participants were traumatized and deeply disturbed.  In fact,

1  two (2) of the participants have filed worker's compensation claims based upon
2  their having participated.

3      80.  Dr. Rios had no choice but to try to talk participants through what
4  had just happened and offer his support to process the very traumatic situation.
5  He also paid for a licensed clinical social worker to host follow up sessions
6  with participants in case they wanted to process this traumatic event.  He
7  reached out to Zoom twice about the incident.  As of June 1, 2020, Zoom had
8  not responded.

9      **C.    Zoom Rejected Dr. Rios's Repeated Pleas to Improve Security**

10     81.  Immediately following the traumatizing incident, Dr. Rios sought
11 help from Zoom by contacting Zoom online and by telephone. Dr. Rios sent
12 an online request to Zoom, reporting the incident and demanding action to
13 remedy the situation and prevent to further Zoombombing.

14     82.  In his own investigation and through emails and other
15 communications with attendees, Dr. Rios believes that the pornographic
16 images that appeared at his webinar were the same as those that are the subject
17 of the case *Saint Paulus Lutheran  Church and Helen N. Cundle, et al. v. Zoom*
18 *Video Communications, Inc.*, USDC Case #5:20-cv-03252 – LK.

19     83.  In an email response to Saint Paulus Lutheran Church dated May
20 6, 2020, Zoom's Trust & Safety department stated that it had identified the
21 intruder and blocked the intruder "from joining future meetings using the same
22 Zoom software." But Zoom refused to take any further action to remedy the
23 situation or to improve the security of its videoconferences. Shockingly, Zoom
24 admitted that the intruder was "a known serial offender who disrupts open

meetings by showing the same video," and had "been reported multiple times to the authorities":

> We identified in your meeting **a known serial offender who disrupts open meetings by showing the same video**, and which **has been reported multiple times to the authorities**. This intruder has the following identifying information:
>
> Christine (iPad)
>
> The report ID for Christine (iPad) is 71731955. You can use this number when you submit your report to link both reports.

It is baffling, to say the least, how Zoom failed to protect Dr. Rios' seminar from a "serial offender" who has been "reported multiple times to the authorities" and who had just recently struck at a church gathering.

84.     Dr. Rios, reported the incidents to the F.B.I. twice as they have now created a special form for on-line reporting these zoombombing pornographic incidents.

## FRAUDULENT CONCEALMENT AND TOLLING

85.     The applicable statutes of limitations are tolled because Zoom knowingly and actively concealed the facts alleged above. Until the revelations made in March 2020, Plaintiff and the Class members did not know and could not have known of the information essential to the pursuit of these claims through no fault of their own and not due to any lack of diligence on their part.

## CLASS ACTION ALLEGATIONS

86.    Plaintiff brings this action as a class action under Rule 23 of the Federal Rules of Civil Procedure, on behalf of a proposed class (the "Class"), defined as:

All persons in the United States who used Zoom during the applicable limitations period.

87.    Excluded from the Class are any entities, including Zoom, in which Zoom or its subsidiaries or affiliates have a controlling interest, Zoom's officers, agents and employees, the judicial officer to whom this action is assigned and any member of the Court's staff and immediate families, as well as claims for personal injury, wrongful death, and emotional distress.

88.    **Numerosity Under Rule 23(a)(1)**. The members of the Class are so numerous that joinder of all members would be impracticable. Based on information and belief, Plaintiff allege that the Class includes millions of members.

89.    **Commonality and Predominance Under Rule 23(a)(2) and 23(b)(3)**. This action involves common questions of law or fact, which predominate over any questions affecting individual Class members, including:

(a)    whether Zoom shared the personal information of Plaintiff and other Class members with third parties without their authorization or consent;

(b)    whether Zoom violated Plaintiff' and Class members' privacy rights;

(c)    whether Zoom intruded upon Plaintiff' and the Class members' seclusion;

(d)     whether Zoom acted negligently;

(e)     whether Plaintiff and other Class members formed implied contracts with Zoom;

(f)     whether Zoom breached implied contracts with Plaintiff and the Class members and breached the implied covenant of good faith and fair dealing;

(g)     whether Zoom violated the CCPA;

(h)     whether Zoom violated the CLRA;

(i)     whether Zoom violated the UCL;

(j)     whether Plaintiff and the Class members were harmed as a result of Zoom's conduct;

(k)     whether Plaintiff and the Class members are entitled to actual, statutory, or other forms of damages or any other monetary relief; and

(l)     whether Plaintiff and the Class members are entitled to equitable relief.

90.     Plaintiff's claims are typical of the members of the Class as all members of the Class are similarly affected by Zoom's actionable conduct. Zoom's conduct that gave rise to Plaintiff' claims is the same for all members of the Class.

91.     Zoom engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff and on behalf of the other Class members. Similar or identical statutory and common-law violations, business practices, and injuries are involved. Individual questions, if any, pale by

comparison, in both quantity and quality, to the numerous questions that dominate this action.

92. Typicality Under Rule 23(a)(3). Plaintiff claims are typical of the claims of the other Class members because, among other things, (a) Plaintiff and the other Class members provided personal information to Zoom; and (b) in its uniform misconduct alleged above, Zoom shared the personal information of Plaintiff and other Class members without their authorization or consent. Plaintiff and other Class members are advancing the same claims and based on the same legal theories. There are no defenses that are unique to Plaintiff.

93. Adequacy of Representation Under Rule 23(a)(4). Plaintiff is an adequate representative of the Class because (a) his interests do not conflict with the interests of the other Class members it seeks to represent; (b) they have retained counsel competent and experienced in complex class action litigation, (c) they will prosecute this action vigorously; and (d) he has no interests that are contrary to or in conflict with the interests of other Class members.

94. **Superiority Under Rule 23(b)(3)**. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all the members of the Class is impracticable.

95. Furthermore, the adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudication of the asserted claims. There should be no difficulty in managing this action as a class action.

96.     Class certification is also appropriate under Rule 23(b)(2) because Zoom has acted or has refused to act on grounds generally applicable to the Class, so that corresponding declaratory relief is appropriate to the Classes as a whole.

97.     California law applies to the claims asserted in this complaint because:

* Zoom is headquartered in California;

* All of Zoom's key decisions and a substantial part of its operations emanate from California;

* A substantial number of the Class members reside in California;

* California has a strong interest in preventing corporations headquartered

in the state from engaging in unfair, unlawful, and deceptive business practices; and

* California has a strong interest in providing redress for its citizens for Zoom's illegal conduct.

## CAUSES OF ACTION

### Count 1

### Negligence

98.     Plaintiff repeats and incorporates by reference each and every allegation set forth above, as though fully set forth herein.

99.     Zoom owed a duty to Plaintiff and the other Class members to exercise reasonable care in (a) using their personal information in compliance with all applicable law and the terms of Zoom's privacy policy; (b) safeguarding their personal information in its possession; and (c) ensuring

security in Zoom's videoconferences. To fulfill this duty, Zoom is obligated to implement and maintain adequate security measures to protect its users' personal information and to avoid disclosure of its users' personal information to any third parties without their knowledge and consent.

100.    Plaintiff and the Class members used Zoom's services in reliance on its exercise of due care and fulfillment of its duties.

101.    Zoom, however, breached its duties by, among other things:

•    disclosing Plaintiff's and other Class members' personal information to unauthorized third parties, including Facebook;

•    allowing third parties to access the personal information of Plaintiff and other Class members;

•    failing to implement and maintain adequate security measures to safeguard users' personal information;

•    failing to timely notify Plaintiff and other Class members of the unlawful disclosure of their personal information; and

•    failing to maintain adequate security and proper encryption in Zoom's videoconferences.

102.    Zoom's misconduct is inconsistent with industry regulations and standards.

103.    Plaintiff and other Class members did not contribute to Zoom's misconduct.

104.    The harm inflicted upon Plaintiff and other Class members is reasonably foreseeable to Zoom.

105.   As a direct and proximate result of Zoom's misconduct, Plaintiff and other Class members have suffered damages relating to, among other things, loss of income, privacy and emotional distress.

## Count II

## Breach of Implied Contract

106.   Plaintiff repeats and incorporates by reference each and every allegation set forth above, as though fully set forth herein.

107.   To generate revenues, attract advertisers, and increase market share, Zoom offered Plaintiff and other Class members to use its services by creating Zoom accounts, which require the provision of confidential, sensitive personal information.

108.   Accepting Zoom's offer, Plaintiff and other Class members obtained user accounts from Zoom and provided Zoom with confidential, sensitive personal information.

109.   By becoming users of Zoom's services, Plaintiff and other Class members entered into implied contracts with Zoom, under which Zoom, for its own benefit, obtained from Plaintiff and other Class members their confidential, sensitive personal information, as well as money. In exchange, Zoom agreed, at least implicitly, to (a) safeguard such information against unauthorized disclosure, access, or use; (b) timely notify Plaintiff and other Class members of any unauthorized disclosure of, access to, or use of such information; and (c) maintain adequate security and proper encryption in Zoom's videoconferences.

110.   Without such an implicit agreement by Zoom, Plaintiff and other Class members would not have entrusted their personal information to Zoom

or paid for its services. Instead, Plaintiff and other Class members would have chosen an alternative videoconference platform that would refrain from sharing their personal information with undisclosed and unauthorized third parties and maintain adequate security and proper encryption in videoconferences.

111. Plaintiff and other Class members fully performed their obligations under the implied contract with Zoom.

112. Zoom, however, breached the implied contracts it made with Plaintiff and other Class members by, among other things:

- disclosing Plaintiff's and other Class members' personal information to unauthorized third parties, including Facebook;

- allowing third parties to access the personal information of Plaintiff and other Class members;

- failing to implement and maintain adequate security measures to safeguard users' personal information;

- failing to timely notify Plaintiff and other Class members of the unlawful disclosure of their personal information; and

- failing to maintain adequate security and proper encryption in Zoom's videoconferences.

113. By breaching its implied contracts with Plaintiff and other Class members, Zoom is not entitled to retain the benefits it received.

114. As a direct and proximate result of Zoom's breaches of the implied contracts, Plaintiff and other Class members have suffered actual losses and damages.

## Count III

### Breach of the Implied Covenant of Good Faith and Fair Dealing

115. Plaintiff repeats and incorporates by reference each and every allegation set forth above, as though fully set forth herein.

116. There is a covenant of good faith and fair dealing implied in every implied contract. This implied covenant requires each contracting party to refrain from doing anything to injure the right of the other to receive the benefits of the agreement. To fulfill its covenant, a party must give at least as much consideration to the interests of the other party as it gives to its own interests.

117. Under the implied covenant of good faith and fair dealing, Zoom is obligated to, at a minimum, (a) implement proper procedures to safeguard the personal information of Plaintiff and other Class members; (b) refrain from disclosing, without authorization or consent, the personal information of Plaintiff and other Class members to any third parties; (c) promptly and accurately notify Plaintiff and other Class members of any unauthorized disclosure of, access to, and use of their personal information; and (d) maintain adequate security and proper encryption in Zoom's videoconferences.

118. Zoom breached the implied covenant of good faith and fair dealing by, among other things:

- disclosing Plaintiff's and other Class members' personal information to unauthorized third parties, including Facebook;

- allowing third parties to access the personal information of Plaintiff and other Class members;

- failing to implement and maintain adequate security measures to

safeguard users' personal information;

•     failing to timely notify Plaintiff and other Class members of the unlawful disclosure of their personal information; and

•     failing to maintain adequate security and proper encryption in Zoom's videoconferences.

119. As a direct and proximate result of Zoom's breaches of the implied covenant of good faith and fair dealing, Plaintiff and other Class members have suffered actual losses and damages.

## Count IV

## Unjust Enrichment

120. Plaintiff repeats and incorporates by reference each and every allegation set forth above, as though fully set forth herein.

121. Zoom has benefited and profited from Plaintiff's and other Class members' use of its videoconferencing services by obtaining their personal information and money.

122. Zoom, however, failed to provide Plaintiff and other Class members the services they reasonably expected because Zoom:

•     disclosed Plaintiff's and other Class members' personal information to unauthorized third parties, including Facebook;

•     allowed third parties to access the personal information of Plaintiff and other Class members;

•     failed to implement and maintain adequate security measures to safeguard users' personal information;

•     failed to timely notify Plaintiff and other Class members of the unlawful disclosure of their personal information; and

- failed to maintain adequate security and proper encryption in Zoom's videoconferences.

123.  Zoom has therefore been unjustly enriched by its retention of the benefits and profits at the expense of Plaintiff and other Class members. Equity and justice require that Zoom disgorge the benefits and profits.

124.  Plaintiff seeks an order directing Zoom to disgorge these benefits and profits and pay restitution to Plaintiff and other Class members.

### Count V

### Violation of the California Consumer Privacy Act

125.  Plaintiff repeats and incorporates by reference each and every allegation set forth above, as though fully set forth herein.

126.  The CCPA prohibits collection and use of consumers' personal information from collection and use by businesses without consumers' notice and consent.

127.  Zoom violated the CCPA by using the personal information of Plaintiff and other Class members without providing the required notice under the CCPA. *See* CAL. CIV. CODE §1788.100(b), §1798.120(b). Zoom did not notify Plaintiff and the Class members that it was disclosing their personal information to unauthorized parties.

128.  Zoom also violated the CCPA by failing to provide notice to Plaintiff and other Class members of their right to opt out of the disclosure or use of their personal information to third parties. *See* CAL. CIV. CODE §1788.100(b), 1798.120(b).  Zoom failed to give Plaintiff and the Class members the opportunity to opt out before sharing their personal information with unauthorized parties.

129.   Plaintiff seeks damages on behalf of himself and the Class, as well as injunctive relief in the form of an order enjoining Zoom from continuing to violate the CCPA.

## Count VI

## Violation of California's Consumer Legal Remedies Act

130.   Plaintiff repeats and incorporates by reference each and every allegation set forth above, as though fully set forth herein.

131.   Plaintiff and each Class Member are "consumers" under the CLRA, see CAL. CIV. CODE §1761(d).

132.   Zoom is a "person" as defined by the CLRA, see CAL. CIV. CODE§ 1761(c).

133.   Zoom's marketing and sale of the Zoom app is the sale of a "good" and "service" to consumers within the meaning of the CLRA, see CAL. CIV. CODE§§ 1761(a)-(b), 1770(a).

134.   The CLRA protects consumers against unfair and deceptive practices, and is intended to provide an efficient means of securing such protection.

135.   As detailed above in paragraphs 26 through 33, Zoom promised to protect data privacy and secure videoconferences. Zoom violated the CLRA by, among other things:

•   disclosing Plaintiff's and other Class members' personal information to unauthorized third parties, including Facebook;

•   allowing third parties to access the personal information of Plaintiff and other Class members;

- failing to implement and maintain adequate security measures to safeguard users' personal information;

- failing to, in a timely manner, (a) investigate the unauthorized disclosures described above, and (b) notify Plaintiff and other Class members of the unauthorized disclosure of, access to, and use of their personal information; and

- failing to maintain adequate security and proper encryption in Zoom's videoconferences.

136.   Zoom's conduct is deceptive and unfair and violates Subsection 1770(a) of the California Civil Code because:

- Zoom represented that its product had characteristics it did not have in violation of Subsection (a)(5);

- Zoom represented its products were of a particular standard, grade, or quality when they were of another in violation of Subsection (a)(7);

- Zoom advertised its services with intent not to sell them as advertised in violation of Subsection (a)(9); and

- Zoom knowingly and intentionally withheld material information from Plaintiff and the Class members in violation of Subsection (a)(14).

137.   Zoom's unfair or deceptive acts and practices were capable of deceiving a substantial portion of the public. Zoom did not disclose the facts of its disclosure of personal information and its lack of capacity to secure videoconferences because it knew that consumers would not use its products or services, and instead would use other products or services, had they known the truth.

138.   Zoom had a duty to disclose the truth about its privacy practices and security capabilities because it is in a superior position to know whether, when, and how it discloses users' information to third parties and whether it can ensure security in videoconferences.

139.   Plaintiff and the Class members could not reasonably have been expected to learn or discover Zoom's disclosure of their personal information to unauthorized parties or Zoom's lack of capacity to secure videoconferences.

140.   The facts concealed by Zoom are material because a reasonable consumer would have considered them to be important in deciding whether to use Zoom.

141.   Plaintiff and the Class members reasonably expected that Zoom would (a) safeguard their personal information and refrain from disclosing it without their consent; and (b) ensure security in Zoom's videoconferences.

142.   Due to Zoom's violations of the CLRA, Plaintiff and the Class members suffered damages and did not receive the benefit of their bargain with Zoom because they paid for a value of services, either through personal information or a combination of their personal information and money.

143.   Plaintiff and the Class members seek an injunction barring Zoom from  disclosing their personal information without their consent and requiring Zoom to ensure Zoom's security in videoconferences.

## Count VII

### Violation of the Unfair Competition Law

144.   Plaintiff repeats and incorporates by reference each and every allegation set forth above, as though fully set forth herein.

145.   Zoom engaged in unfair, unlawful, and fraudulent business practices within the meaning of the UCL, CAL. Bus. & PROF. CODE §§ 17200, *et seq.*

146.   Zoom collected and stored confidential, sensitive personal information from Plaintiff and other Class members. Zoom falsely represented to Plaintiff and other Class members that:

(a)   "[w]e do not sell your data";

(b)   Zoom maintains adequate security measures to safeguard and keep confidential users' personal information;

(c)   Zoom limits its use of users' personal information "to determine the offers to make for [its] services, analyze trends on and run the marketing site, and understand users' movements around the marketing site"; and

(d)   Zoom provides "[s]ecurity and encryption ... with complete end-to-end 256-bit AES encryption[.]"

147.   In reliance on Zoom's representations, Plaintiff and other Class members obtained Zoom accounts and provided Zoom with confidential, sensitive personal information.

148.   Zoom's misrepresentations and omissions caused Plaintiff and other Class members to become Zoom users and provide Zoom with their confidential, sensitive personal information. Plaintiff and other Class members would not have done so, but for Zoom's misrepresentations and omissions.

149.   Zoom's misrepresentations   and   omissions   are   unfair, unlawful, and fraudulent. Zoom's acts, as alleged above, are "unfair" because they offend an established public policy and are immoral, unethical, and

unscrupulous or substantially injurious to consumers. Zoom's acts, as alleged above, are "unlawful" because they violate the common law and several California statutes, including the CCPA and CLRA. Zoom's acts, as alleged above, are "fraudulent" because they are likely to deceive the general public.

150.   In addition to making these misrepresentations and omissions, Zoom also violated the UCL by (a) failing to timely notify Plaintiff and other Class members of the unauthorized disclosure of, access to, and use of their personal information; (b) preventing Plaintiff and other Class members from taking the necessary measures to remedy the unauthorized disclosure of their personal information; and (c) failing to maintain adequate security and proper encryption in Zoom's videoconferences.

151.   Zoom's business practices violate the UCL also because Zoom (a) falsely represented that goods or services have characteristics they do not have, namely, adequate security; (b) falsely represented that its goods or services are of a particular standard when they are of another; (c) advertised its goods and services with intent not to sell them as advertised; (d) represented that the subject of a transaction was supplied in accordance with a previous representation when it was not; and (e) made material omissions regarding its safeguarding of users' personal information.

152.   Plaintiff and other Class members suffered injury in fact and lost money or property as the result of Zoom's violations of the UCL.

153.   Plaintiff requests that Zoom be (a) enjoined from further violations of the UCL; and (b) required to restore to Plaintiff and other Class members any money it had acquired by unfair competition, including restitution and restitutionary disgorgement.

## Count VIII

## Invasion of Privacy in

## Violation of Common Law and the California Constitution

154.   Plaintiff repeats and incorporates by reference each and every allegation set forth above, as though fully set forth herein.

155.   Under the common law and Section 1 in Article I of the California Constitution, Plaintiff and the Class members have a reasonable expectation of privacy in their personal information, their electronic devices (including computers, tablets, and mobile phones), and their online behavior and history (including their use of Zoom's services).

156.   The reasonableness of such expectations of privacy finds support in Zoom's unique position to monitor Plaintiff's and the Class members' behavior through its access to their electronic devices and videoconferences. The surreptitious, highly technical, and non-intuitive nature of Zoom's disclosure of their personal information further underscores the reasonableness of their expectations of privacy.

157.   Plaintiff's and Class members' privacy interest is legally protected because they have an interest in precluding the dissemination or misuse of sensitive information and an interest in making intimate personal decisions and conducting activities like a videoconferencing without observation, intrusion, or interference.

158.   Zoom shared Plaintiff's and the Class members' personal information, without their authorization or consent, with third parties, including Facebook.

159.   Zoom's acts and omissions caused the exposure and publicity of private details about Plaintiff and other Class members - matters that are of no concern to the public.

160.   This intrusion is highly offensive to a reasonable person. Zoom's conduct alleged above is particularly egregious because Zoom concealed its conduct from Plaintiff and other Class members, and because Zoom represented to Plaintiff and other Class members that it considered privacy to be "an extremely important topic" and took their privacy "very seriously."

161.   As a direct and proximate result of Zoom's conduct, Plaintiff and Class members were harmed by the public disclosure of their private affairs.

162.   Plaintiff and other Class members seek damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and on behalf of all members of the Class, respectfully request that the Court enter judgment in favor of them and against Zoom:

A.   certifying this action as a class action under Federal Rule of Civil Procedure 23, appointing Plaintiff as Class Representatives, and appointing his counsel as Class Counsel;

B.   declaring that Zoom's conduct alleged in this complaint is unfair, unlawful,  and fraudulent in violation of the CCPA, the CLRA, and the UCL, and that Zoom is liable for negligence, breach of implied contract, breach of the implied covenant of good faith and fair dealing, and unjust enrichment;

C.   enjoining Zoom from engaging in the negligent, unfair, unlawful, and fraudulent business practices alleged in this complaint;

D.    awarding Plaintiff and other Class members actual, compensatory, consequential, punitive, and treble damages to the extent permitted by law, including statutory damages available under the CCPA, except as to Count VI for violation of the CLRA;

E.    ordering Zoom to disgorge all benefits and profits unjustly retained through its misconduct alleged in this complaint;

F.    awarding Plaintiff and other Class members pre-judgment and post-judgment interest;

G.    awarding Plaintiff and other Class members reasonable attorneys' fees and costs, including expert witness fees; and

H.    granting such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury.

Dated: June 2, 2020                Respectfully submitted,

LAW OFFICES OF JOHN L. FALLAT
John L. Fallat (SBN #114842)
Timothy J. Tomlin (SBN #142294)
Mark A. Vaughn (SBN #241228)
68 Mitchell Blvd., Suite 135
San Rafael, CA 94903-2046
Telephone:  (415) 457-3773
Facsimile:    (415) 457-2667

Curriculum Vitae                                                                                         Victor M. Rios

# VICTOR M. RIOS
**April 2020**

Department of Sociology
University of California, Santa Barbara                    E-mail: vrios@soc.ucsb.edu
Santa Barbara CA 93106-9430

*Research and teaching interests:*

Race and Justice; Inequality;
Ethnography; Educational Equity

\*

## EDUCATION

***Ph.D***.     Comparative Ethnic Studies, University of California, Berkeley, 2005
              **(Dissertation Advisor: Ronald Takaki)**

***M.A.***     Comparative Ethnic Studies, University of California, Berkeley, 2002

***B.A***.     Human Development, Emphasis in Adolescent Development,
              California State University Hayward, 2000

## PROFESSIONAL EXPERIENCE

2018-Present  ***Associate Dean of Social Sciences,*** *Division of Social Sciences,*
              University of California, Santa Barbara

2015-Present  ***Professor,*** Department of Sociology, University of California, Santa
              Barbara

2011-2015     ***Associate Professor***, Department of Sociology, University of California, Santa
              Barbara

2006-2011     ***Assistant Professor***, Department of Sociology, University of California, Santa
              Barbara

2007-2008     ***Ford Foundation Postdoctoral Fellow***, Department of Social and Behavioral
              Sciences, University of California, San Francisco (Supervised by Dr. Howard

1



Curriculum Vitae                                                                                                Victor M. Rios

Pinderhughes)

2005-2006    *Assistant Professor*, Department of Sociology, University of San Francisco

1998-2000    *Youth Programs Director*, Community Bridges Beacon, San Francisco, CA


**BOOKS (Academic Press)**

Rios, V.M. (2017) *Human Targets: Schools, Police, and the Criminalization of Latino Youth.*  University of Chicago Press.
>               *\*LA Times Book Festival Selection (2017)*
>
>               *\*Audio book with Audible*

Rios, V.M. (2011) *Punished: Policing the Lives of Black and Latino Boys.*  New York University Press.
>               *\*Eduardo Bonilla-Silva Book Award, Honorable Mention,*
>               Society for the Study of Social Problems (2014)
>
>               *\*Oliver Cromwell Cox Book Award,* American Sociological Association,
>               Section on Racial and Ethnic Minorities (2013)
>
>               *\*Outstanding Book Award, Honorable Mention,* American Sociological
>               Association, Section on Inequality, Poverty, and Mobility (2013)
>
>               *\*C. Wright Mills Book Award, Finalist,* Society for the Study of Social Problems
>               (2012)
>
>               *\*Distinguished Book Award,* American Sociological Association, Section on
>               Latina/o Sociology (2012)
>
>               *\*Audio book with Audible*

Rios, V.M. and Mireles-Rios, R. (Under Contract with Duke University Press)
*Opportunity Gaps: Teacher Support, Race, and The Future of Public Education.*
(Dataset from a completed two-year school ethnography and survey study on the
opportunity gap between White and Latino high school students)

2

**ARTICLES AND CHAPTERS** (*=graduate/undergraduate student)

Rios, V.M., *Prieto G., *Ibarra J. 2020. "*Mano Suave—Mano Dura*: Legitimacy Policing and Latino Stop and Frisk." *American Sociological Review*.

Mireles-Rios, R., Rios, V.M., *Reyes, A. 2020. "Pushed Out for Missing School: The Role of Health Disparities and High School Truancy." *Education Science*.

Mireles-Rios, R., Rios, V.M., *Auldridge-Reveles, T., *Monroy, M., & *Castro, I. 2020. " 'I was pushed out of school': Social and emotional approaches to a youth promotion program." *Journal of Leadership, Equity, and Research*.

*Williams, C., Mireles-Rios, R., & Rios, V.M. (2020) Development of Life Skills: Perceptions of African-American High School Football Players. *Journal of Student-Athlete Development and Success*.

*Cobbina, J., Soma C., *Conteh, M., & Rios, V.M. 2018. "I Will Be Out There Everyday Strong!" Protest Policing and Future Activism among Ferguson Protesters." *Sociological Forum*.

Rios, V.M., *Carney, N., *Kelekay, J. 2017. "Ethnographies of Race, Crime, and Criminal Justice." *Annual Review of Sociology*.

Rios, V.M. and *Patrick Lopez-Aguado 2017. "Masculinity, Style and Resistance." *Vestoj*.

Rios, V. M. 2017. "The consequences of the criminal justice pipeline on Black and Latino masculinity." (Reprint) In DeKeseredy and Dragiewicz *Critical Concepts in Criminology*: *The Foundations of Critical Criminology*. Routledge

Rios, V.M. and Martino-Taylor, L. 2016. "Documenting and Participating in History in the Making: The Ferguson Research-Action Collaborative." *Berkeley Journal of Sociology*. Published on-line March 22, 2016.

*Witenko, V., Mireles-Rios, R. and Rios, V.M. 2016. "Networks of Encouragement: Who's encouraging Latino students and White students to enroll in honors and Advanced Placement (AP) courses?" *Journal of Latinos and Education*.

Rios, V.M. 2016. "Beyond Power-blind Ethnography." *Sociological Focus*.

Rios, V.M. and *Guzman, Melissa. 2016. Latino Youth and Criminal Justice. In Morin, Jose Luis *Latinas/os and Criminal Justice: An Encyclopedia*. Santa Barbara, CA: ABC-CLIO

Rios, V.M. 2016.  Policed, Punished, Dehumanized: The Reality for Young Men of Color Living in America. In Johnson, Devon et. al *Deadly Injustice: Race, Criminal Justice and the Death of Trayvon Martin.*

Rios, V.M. 2015.  "Decolonizing the White Space in Urban Ethnography." City and Community.

Rios, V.M. and *Sarabia, Rachel.  2015 Synthesized Masculinities: The Mechanics of Manhood among Delinquent Boys. In Pascoe, CJ and Bridges, Tristan *Exploring Masculinities: Identity, Inequality, Continuity and Change.* Oxford University Press

Rios, V.M. 2015 Race and Deviance: Policing the Lives of Black and Latino Boys. In Goode, Erich Wiley Handbook on Deviance

Rios, V.M. and *Galicia, Mario. 2013.  "Smoking Guns or Smoke & Mirrors?: Schools and the Policing of Latino Boys."  The Association of Mexican American Educators Journal.

Rios, V.M. 2013. The Labeling Hype: Coming of Age in the Era of Mass Incarceration. Dunier, Mitch et. al. (Reprint) in *The Urban Ethnography Reader.*  Oxford: Oxford University Press.

Rios, V.M. and *Lopez-Aguado. 2012.  Performance of Cholo Style as Identity of Resistance. In Aldama, Arturo et.al. *Performing the U.S. Latina and Latino Borderlands.* Indiana: Indiana University Press.

Rios, V.M. 2012. Stealing a Bag of Potato Chips and Other Crimes of Resistance. *Contexts. American Sociological Association. Vol. 11, N. 2*

Rios, V.M. and *Martinez.  2011. Examining the Relationship Between African American and Latino Street Gangs: Conflict, Cooperation and Avoidance in Two Multi-Racial Urban Neighborhoods. In Telles, Edward et. al. *Just Neighbors? Research on African American and Latino Relations in the U.S.*  New York: Russell Sage Foundation.


**BOOKS (Trade Press)**

Rios, V.M. and Mireles-Rios, R. (2019).  ***My Teacher Believes in Me!: The Educator's Guide to At-Promise Students.*** Five Rivers Press.

Rios, V.M., Bredenoord, C., Carias, J. (2016).  ***Project GRIT: Generating Resilience to Inspire Transformation.***  Five Rivers Press.

Rios, V.M. and Carias, J. (2016).  ***Buscando Vida, Encontrando Éxito: La Fuerza de La Cultura Latina en la Educación*** (2016). Five Rivers Press.

Rios, V.M. (2011). *Street Life: Poverty, Gangs, and a Ph.D.* Five Rivers Press.

Rios, V.M. and Zohoori, (Forthcoming) *Let's Be Real, Man: Masculinity in a Culture of Violence.* Fiver Rivers Press.

## SELECTED AWARDS AND HONORS

| | |
|---|---|
| 2020 | *Andrew Carnegie Fellow*, Finalist, Carnegie Corporation of New York. |
| 2019 | *Research Fellow,* Latinx Education Research Center (LERC), School of Education and Counseling Psychology, Santa Clara University |
| 2017 | *Nominee for Vice President*, American Sociological Association, (selected as one of two nominees for Vice President of the ASA) |
| 2017 | *Public Understanding of Sociology Award*, American Sociological Association, ("For exemplary contributions to advance the public understanding of sociology, sociological research, and scholarship among the general public.") *One of eight major awards given by an association with over 13,000 members* |
| 2017 | *40 Under 40 Award*, California State University, East Bay ("Honoring outstanding young alumni.") |
| 2015 | *Coramae Richey Mann Research Award* American Society of Criminology, Division on People of Color and Crime.  (The *Coramae Richey Mann Research Award* recognizes a scholar who has made outstanding contributions of scholarship on race/ethnicity, crime, and justice). |
| 2015 | *Vice President of the United States Hispanic Heritage Month Celebration Honoree.*  Invited to VP Joe Biden's home to celebrate prominent Latino leaders.  September 2015. |
| 2015 | *The Joyce Foundation DC convening on gun violence, policing and mass incarceration.*  Invited to the White House to have a discussion with the Obama administration regarding gun violence, policing and mass incarceration. June 2015. |
| 2015 | *TED Talks Live Presenter.*  New York City, November 2015. |
| 2014 | *Senior Fellow*, Yale University Urban Ethnography Project. |
| 2013 | *Proclamation Honoring Dr. Victor Rios for his Work on Youth Violence Prevention*, City of Berkeley, Berkeley, CA. |

2013            ***Award of Excellence in Mentoring***, University of California, Santa Barbara,
                Student Life and Activities.

2013            ***Volunteer Recognition for 7 years of Service to Isla Vista Elementary School***,
                Goleta Union School District.

2012            ***Distinguished Teaching Award***, University of California, Santa Barbara,
                Academic Senate

2011            ***Harold J. Plous Award*** , University of California, Santa Barbara,
                College of Letters and Science.  (One of the university's most prestigious
                faculty honors, given annually to an assistant professor from the
                humanities, social sciences, or natural sciences who has shown exceptional
                achievement in research, teaching, and service.)

2011            ***Outstanding Member of the Academic Community***, University of California
                Santa Barbara of Sociology, Inter-Greek Council

2010            ***New Scholar Award,*** American Society of Criminology, Division on
                People of Color and Crime

2010            ***Chancellor's Award for Excellence in Mentoring Undergraduate
                Research***, University of California, Santa Barbara, College of Letters and
                Sciences. (Awarded to only one faculty member at UCSB each year)

2010            ***Outstanding Teacher Award,*** University of California, Santa Barbara,
                Residence Halls Association

2010            ***Margaret T. Getman Service to Students Award,*** University of California,
                Santa Barbara, Division of Student Affairs.

2005            ***Esther Madriz Faculty Service Award,*** University of San Francisco

2002            ***Outstanding Graduate Student Instructor,*** University of California, Berkeley,
                Graduate Division

## ADMINISTRATIVE EXPERIENCE

2019            ***Founding Associate Director***, Center for Publicly Engaged Scholarship, UCSB

2019            ***Member***, American Sociological Association, Nominations Committee, Section
                on Sociology of Education.

2019            ***Chair Elect***, American Sociological Association, Section on Crime, Law,

Deviance (Elected)

2019        *Chair,* UCSB Associate Vice Chancellor for Diversity, Equity, and Inclusion. Search Committee (National Search)

2019        *Chair,* Department of Sociology: Race, Ethnicity, Nation.  Search Committee (National Search)

2018-Present **Board Member**, McCune Foundation, Sage Publications.

2017        *Co-chair,* UCSB Center for Black Studies Research, Director Search Committee (National Search)

2017        American Sociological Association, *Chair*, Latina/o Sociology Section (Elected)

2015-2016   Montessori Center School, *Trustee*.

2013-2016   *Executive Committee Member*, Department of Sociology, UCSB

2015-2016   American Society of Criminology, *Program Committee Member*.

2015-2016    American Sociological Association, *Committee on Sections Member.*

2014-Present *Chancellor's Committee on the Status of Isla Vista, UCSB*

2014-Present *Committee on Admissions, Enrollment and Relations with School Members. Academic Senate. UCSB*

2015-Present *Human Subjects Committee, **Prisoner Representative**, UCSB*

2015        Section on Inequality. Poverty, and Mobility, ASA, *Nominations Committee*

2014        *Hiring Committee Chair, Sociology of Immigration, UCSB*

2014        *UCSB **Trustee's Committee** on Isla Vista*

2014        *Campus Policy Committee on Security Video Recording, Office of the Vice Chancellor Administrative Services, UCSB*

2014, 2015  *Nominations Committee, American Sociological Association.  (Elected).*

2014        *Section on Crime, Law, Deviance. **Council Member** American Sociological Association. {Elected}.*

Victor M. Rios

2013              **Search Committee** *for Director of the Center for Black Studies. UCSB*
                  *Office of Research*

2013-2017         **Diversity Director***, UCSB Department of Sociology.*

2013-Present      *Student Fee Advisory Committee,* **Faculty Representative,** *UCSB.*
                  *(Nominated by UCSB faculty senate's committee on committees, appointed by*
                  *chancellor.  Committee overseeing millions of dollars in student funds.)*

2013-Present      **Faculty Advisory Board Member***, UCSB Certificate in College and*
                  *University Teaching.*

2012-Present      *UCSB Extension,* **Course Approval Faculty.**

2011              **Hiring Committee***, Demography, Department of Sociology UCSB.*

2011              **Executive Board Member,** *Western Society of Criminology*

2011-2013         **PTA President***, Isla Vista Elementary School, Isla Vista, California.*

2010-2016         **Committee Member and Chair,** *American Sociological Association,*
                  Committee on Racial and Ethnic Minorities

2010-2013         *Chicano Studies Institute UCSB,* **Advisory Board Chair**

2009-Present      *Center for Black Studies UCSB,* **Advisory Board Member**

2009              **Hiring Committee,** *UCSB Chief of Police*

## SELECTED FELLOWSHIPS AND GRANTS

2017-2020         **Robert Wood Johnson Foundation ($120,000 Co-PI)**

2011-2015         **William T. Grant Foundation, Investigator Initiated Grant ($305,000)**

2008, 2009        **UCSB Academic Senate Pearl Chase Research Grants ($50,000)**

2008              **UC Berkeley Population Center Research Grant ($10,000)**

2008              **UC Institute for Mexico and the United States ($25,000)**

2008              **Ford Foundation Postdoctoral Fellowship ($40,000)**

2001-2004         **Ford Foundation Predoctoral Fellowship ($60,000)**

## LEADERSHIP AND AFFILIATIONS

2019            **Chair,** Book Award Selection Committee, American Sociological Association

2018            **Member,** Book Award Selection Committee, American Sociological
                Association

2018            **Member,** Nominations Committee, American Society of Criminology

2018            **Member,** Book Award Committee, American Society of Criminology

2017            **Member,** American Sociological Association,
                Public Engagement Advisory Committee

2017            *Council Member*, American Sociological Association,
                Section on Racial and Ethnic Minorities

2016            Chair, *C. Wright Mills Book Award Committee*, Society for the Study of
                Social Problems.

2016            *Early Career Award Committe*, Section on Racial and Ethnic Minorities, ASA

2015            *Editorial Board Member*, American Sociological Review.

2015            *Editorial Board Member,* Sociology of Race and Ethnicity.

2014-2018       *Macarthur Fellowship Program Evaluator,*
                John D. and Catherine T. MacArthur Foundation

2014            *Member, Book Award Selection Committee*, Division on Racial and Ethnic
                Minorities, Society for the Study of Social Problems.

2014            *Member, Book Award Selection Committee*, Section on Crime, Law, Deviance.
                American Sociological Association.

2014            *Chair, Distinguished Teaching Award Committee,* American Society of
                Criminology.

2014            *C. Wright Mills Book Award Committee Member*, Society for the Study of
                Social Problems.

2014            *Invited Plenary Session Organizer for the ASA Annual Conference,* American
                Sociological Association

| | |
|---|---|
| 2013 | *C. Wright Mills Book Award Committee Member*, Society for the Study of Social Problems. |
| 2013 | *Distinguished Book Award Chair,* American Sociological Association, Section on Latina/o Sociology |
| 2011 | *Invited Plenary Session Organizer for the ASA Annual Conference,* American Sociological Association |
| 2011-Present | *Editorial Board Member, Contexts, American Sociological Association* |
| 2010-2012 | *Executive Council Member,* American Society of Criminology, Division on People of Color and Crime |
| 2009-2010 | *Advisory Board Member, Santa Barbara School District, Youth Violence Prevention & Intervention Committee* |
| 2008-2009 | *Section Newsletter Editor* American Sociological Association, Latino Sociology Section |
| 2008-Present | *Editorial Board Member,* Aztlan: A Journal of Chicano Studies |
| 2007-2012 | *Committee Member, Pacific Sociological Association, Committee on Race and Ethnic Minorities* |
| 2007-Present | *Racial Democracy, Crime and Justice Network Member,* Ohio State University/National Science Foundation |
| 2007 | *Faculty, Judicial Council of California, Center for Families, Children and the Courts, Beyond the Bench Conference for Judges* |
| 2006-Present | *Advisory Board Member,* Kirwin Institute for the Study of Race an Ethnicity, Ohio State University, African American Male Project |
| 2005-Present | *Affiliated Faculty, Center for Culture, Immigration and Youth Violence Prevention University of California, Berkeley, Institute for the Study of Societal Issues* |

## PUBLICLY ENGAGED SCHOLARSHIP

*2018  The Pushouts.* Writer and Research Consultant of a documentary film funded by the Corporation for Public Broadcasting, Latino Public Broadcasting, The Ford Foundation, Britdoc, YouthBuild USA, and Sundance. The Pushouts aired on national TV in December 2019 (PBS).

10

*\* Best Feature Documentary, Hispanic Culture Film Festival (2019)*
*\* Special Jury Award, MINT Film Festival, 2018*
*\*Best Documentary, Imagen Awards (2018)*
*\*Honorable Mention, Best Documentary, Urbanworld (2018)*
*\*Best of Festival, Berkeley Film Foundation, (2018)*
*\*Best Documentary, Chicago Impact Project, (2018)*

*2018    How Can Mentors Guide Kids To Live Up To Their Full Potential?*
Ted Radio Hour, National Public Radio

## SELECT KEYNOTE ADDRESSES

Commencement Speaker.  Saddleback College. May 2019.

Commencement Speaker.  Graduate School of Education, University of California, Berkeley.
May 2018.

"The Power of Mentoring and Emotional Support in Future Ready Education." National
Academies Foundation.  Washington DC.  July 2018.

"How Mentoring and Counseling Create Unstoppable Futures."  Denver Kids Conference.
May 2018.

"Urban Dynamism, Sociological Double-Counsciousness, and Paradoxical Resistance:
Towards a New Paradigm for Studying Racialized Punitive Social Control."
Northeastern Sociological Association Plenary Keynote.  April 2018.

"Best Practices in Mentoring."  National Mentor Conference.  Washington DC.  January
2018.

"The Role of Culture in Racialized Punitive Social Control."  Harvard University.
Department of Sociology.  October 2017.

"Strengthening the Continuum of Care."  Advancing Improvement in Education.  San
Antonio Texas. September 2017.

"Social Justice and Equity in Public Education."  University of Southern California.
EdMonth. March 2017.

*"Race, Policing, and Public Health."* Stanford Medicine.  March 2017.

*"Policing the Lives of Youth of Color and the School to Prison Pipeline."*
The American Psychology-Law Society, American Psychological Association. August 2016.

## REVIEW WORK

American Education Research Journal
American Journal of Sociology
American Sociological Review
American Anthropologist
American Quarterly
Criminology
Contemporary Ethnography
Sociology Compass
Justice Quarterly
Social Justice
Social Problems
The Journal of Criminal Justice
Contemporary Sociology
Sociological Quarterly
Race and Justice
Aztlan

## ASSOCIATION MEMBERSHIP

American Sociological Association, Member, 1999-Present.
American Education Research Association, 2011-Present.
American Studies Association, Member, 2002- Present.
National Association of Chicana and Chicano Studies, Member, 2002-Present.
American Society of Criminology, Member, 2007-Present.
Society for the Study of Social Problems, Member, 2007-Present.